Luther E. GOVREAU, Employee,
Plaintiff-Respondent,

v.

FARMINGTON TRANSFER COMPANY,
Employer, Defendant-Appellant.

No. 34080.

St. Louis Court of Appeals,
Missouri.

Oct. 6, 1971.

Motion for Rehearing or to Transfer to Supreme Court Denied Nov. 29, 1971.

Application to Transfer Denied Jan. 10, 1972.

Roberts & Roberts, Farmington, for defendant-appellant.

Nolde & Hilgendorf, St. Louis, for plaintiff-respondent.

PER CURIAM.

This is an appeal from a judgment of the Circuit Court of St. Francois County affirming a final award of the Industrial Commission. The claim for compensation was filed by Luther E. Govreau on May 25, 1963. It alleged an injury by accident which occurred on February 6, 1963. On June 20, 1963 the employer, Farmington Transfer Company, and its insurer filed a joint answer in which they denied generally all the allegations contained in said claim. The answer also contained an affirmative allegation that any disability, temporary or permanent, which claimant may have sustained was due to incidents which were not accidents within the meaning of the Workmen's Compensation Law, and therefore not compensable.

A hearing was had before Edwin F. Ragland, a referee of the Division of Workmen's Compensation. By an award dated February 2, 1968 the referee denied compensation to ·claimant finding that he did not sustain an accident arising out of and in the course of his employment with Farmington Transfer Company.

On February 9, 1968 claimant filed an application for review by the Industrial Commission. On May 12, 1970 the Industrial Commission issued its final award reversing the award of the referee and awarded compensation in the total amount of $10,514.46. This included $1,064.46 for medical aid, $47.50 per week for twenty weeks healing period, and for permanent partial disability $42.50 for two hundred weeks. On May 18, 1970 employer and insurer appealed to the Circuit Court of St. Francois County. On July 31, 1970 the Circuit Court affirmed the award of the Industrial Commission. On August 5, 1970 Farmington Transfer Company filed its notice of appeal to the Supreme Court.

Thereafter the Supreme Court transferred the case to this court. On December 16, 1970 the cause, together with the Supreme Court's mandate, was received and filed in this court, and the case. was set for hearing. Briefs were filed in this court by the parties and the case was argued and submitted on April 7, 1971.

In reaching our decision we must review the evidence in a light most favorable to the finding and award of the Commission, consider all reasonable inferences favorable to claimant which the Commission was entitled to draw from the evidence, and determine if in fact the testimony was somewhat contradictory so that a question of credibility was presented for determination by the Commission. Davies v. Carter Carburetor, Division ACF Industries, Inc., Mo.Sup., 429 S.W.2d 738. The findings of the referee are not binding on the Commission if, upon consideration of all the evidence, the Commission reaches a conclusion different from that found by the referee. Brown v. Griesedieck Western Brewing Co. of Mo., Mo.App., 250 S.W.2d 803, l.c. 809. The duty of this court on appeal is to determine whether the award of the Commission is supported by competent and substantial evidence upon the whole record. We may not substitute our judgment for that of the Commission, but are authorized only to decide if such tribunal could reasonably have made its finding upon consideration of all the evidence before it, and to set aside its decision only if it is contrary to the overwhelming weight of the evidence. Wood v. Wagner Elec. Corp., 355 Mo. 670, 197 S.W.2d 647; Seabaugh's Dependents v. Garver Lumber Mfg. Co., 355 Mo. 1153, 200 S.W.2d 55.

At the hearing before the referee the parties agreed that on February 6, 1963, the date of the alleged accident, Farmington Transfer Company was operating under the provisions of the Missouri Workmen's Compensation Law; that its liability under said act was insured by Fidelity and Casualty Insurance Company; that on

February 6, 1963 Luther E. Govreau was employed by Farmington Transfer Company and was working under the provisions of the Missouri Workmen's Compensation Law; that the claim for compensation was filed within the time prescribed by law; that the weekly compensation rate in 1963 was $42.50 for permanent partial disability and $47.50 for temporary total disability; that no compensation has been paid claimant; and no medical aid has been furnished claimant by Farmington Transfer but was provided for by claimant. The real contested issue tried was whether claimant sustained an injury by reason of an accident arising out of and in the course of his employment.

At the time of the hearing before the referee on October 14, 1966, claimant was thirty-eight years old. He resided in St. Francois County south of Farmington on Highway H. On February 6, 1963 he was employed by Farmington Transfer Company as a truck driver, and on said date had been so employed for a period of five years. His duties involved delivering freight for his employer. The freight would be brought from St. Louis in different trucks to the Farmington Terminal. Each morning drivers employed by Farmington Transfer Company would load their trucks with those items to be delivered to customers on their regular routes.

In June, 1962 claimant suffered chest pains on occasions. He described these pains as a feeling in the front part of his stomach like gas or indigestion. He testified that these pains did not always occur upon exertion or occur more frequently in cold weather. However, he did state that he had experienced them in cold weather. Claimant testified that in June, 1962 he consulted Dr. Huckstep of Farmington concerning his condition. Dr. Huckstep testified that this consultation was on June 9, 1962.

Dr. Huckstep testified that on June 9, 1962 claimant told him that he had experienced pain upon exertion or when he was working hard, and that he had suffered from this pain for about two weeks. Dr. Huckstep gave claimant pills to relieve the pain. Claimant was also given a chest x-ray and a blood count by the doctor at that time. Dr. Huckstep further testified that the examination disclosed that claimant's heart was normal.

Dr. Huckstep examined Claimant in January, 1963. At that time claimant suffered from coronary insufficiency, which in the doctor's opinion was due to arteriosclerosis. This condition ordinarily takes a period of weeks or months to develop.

Claimant testified he was not advised by Dr. Huckstep to terminate his employment or change his way of life at the time of the June, 1962 examination.

Claimant reported for work on the morning of February 6, 1963. After his arrival he selected the packages destined for delivery to persons on the route assigned to him. He loaded the packages on a semi-trailer attached to a tractor. The bed of this trailer was four to four and one-half feet above the pavement. The floor of the trailer was composed of stainless steel, and at the rear had a lip that extended above the trailer floor one inch, possibly one and three-quarters or two inches. The rear doors were hinged to the sides of the trailer, and met and were fastened at the rear center of the trailer below the trailer floor.

After loading the trailer claimant left the terminal of Farmington Transfer Company and began making delivery of the packages. At about 9:15 A.M., while delivering packages to the Firestone store in Farmington, he claims to have sustained the accidental injury for which he seeks compensation in this action.

When claimant arrived at Firestone he parked the tractor-trailer on the paved street in the front of the store. He then carried several packages into the store. The packages were at the rear of the trailer where he could reach them while stand-

ing in the street. There were two packages that he could not reach from that position which made it necessary for him to climb into the trailer and move them to the rear where he could reach them. He stood behind the trailer close to its right side and placed both hands on the side of the trailer as high as he could reach. He then placed the toe of his left foot on the floor of the trailer and the ball of the foot partly on the floor and partly on the lip of the floor at the rear of the trailer. He testified that this was the customary manner of getting into the trailer. When in the above mentioned position he shifted his weight to his left foot and while holding to the side of the trailer and while pulling himself upward his right foot cleared the ground and his left foot slipped forward. He was then left hanging by his arms at which time he experienced severe pain in his chest. He then fell forward into the trailer. He remained in this position for a short period of time, then moved the two packages to the rear of the trailer where he could reach them from the street. He then got out of the trailer and carried the packages into the store. He was still suffering from severe pain in the chest and by this time was covered with perspiration. He testified that he was frightened and was given permission by the store manager to call his company office. He talked to Mr. Lee Hathaway, the terminal manager for Farmington Transfer Company, and asked to be relieved. Mr. Hathaway told claimant that he would be relieved in fifteen or twenty minutes. Claimant further testified that the tractor-trailer was double parked and he moved it around the corner where it would be out of traffic. In about fifteen minutes Mr. Hathaway arrived. Claimant stated he told Mr. Hathaway that he had slipped in the truck " * * * and I got this terrible chest pain and I wanted to go home and see a physician."

In a deposition, claimant, in answer to a question put to him, stated: "I told him (Hathaway) that I had this severe chest pain and that I wanted to be relieved from duty." However, when confronted with this answer claimant testified he was sure he told Mr. Hathaway at the time he had slipped.

Mr. Hathaway, a witness called by the employer and insurer, testified that when he arrived at the Firestone store Govreau did not tell him the specific nature of his illness but when in his car complained of chest pains and difficulty in breathing. Claimant sat in Mr. Hathaway's office for a while and was told he should see a doctor. Thereafter claimant got into his car and drove home. Mr. Hathaway testified he went to see claimant in the hospital and that claimant did not at that time say what caused his illness. Hathaway further testified he did not recall claimant ever telling him of having an accident on February 6, 1963 or an unusual strain on that date.

During the evening of either February 6 or February 7 claimant had an attack of severe pain. He telephoned the office of Dr. Huckstep and talked to Dr. Karraker. He was given an appointment to see the doctor on February 8, 1963 at the doctor's office. He was seen and examined by Dr. Karraker on that date, at which time an EKG was administered. He was also given an injection of morphine and sent home. He was told to return the next day to be seen by Dr. Huckstep. He did return as directed. After an examination, Dr. Huckstep was of the opinion that he was suffering heart pain and advised him to go to a hospital. Then with claimant's consent Dr. Huckstep put him under strong medication giving him morphine and nitroglycerin. He was taken in an automobile driven by his wife to St. Luke's Hospital in St. Louis. When he arrived at the hospital he was immediately taken to a room and put to bed. He was told that he was in a very serious condition. An EKG was administered after which a diagnosis of myocardial infarction was made. Claimant remained in the hospital twenty-one days.

On February 9, 1963 Dr. Huckstep examined the EKG taken February 8, 1963

and the one taken the following day. He testified that they were negative except for extra heart beats, and showed no change from the one he took in June, 1962. He further testified that electrocardiograms do not show changes indicative of myocardial infarction until one or two days after the initial pain, but from that fact it could not be assumed that the infarction had not occurred. He stated that on February 9, 1963 claimant told him that after the morphine injection administered by Dr. Karraker February 8 he continued to have pain through the night and became nauseated and was unable to sleep because of the persistence of the pain. Because of the circumstances he sent claimant to St. Luke's Hospital to be seen by Dr. James Nickel.

In answer to a hypothetical question Dr. Huckstep gave an opinion that the infarction suffered by claimant was produced by the accident and strain he encountered February 6, 1963.

On cross-examination Dr. Huckstep testified that claimant had pre-existing arteriosclerosis with coronary insufficiency. The arteriosclerotic process is a narrowing of the interior of the arteries which takes a considerable time to develop, ordinarily a period of weeks or months. In such a situation the person affected will be free of pain, but by exertion the heart muscle will require more blood which is not possible with the result that the person will experience pain. If there is a temporary cutoff of blood supply an infarction may not occur. It can be caused either by a thrombosis or by arteriosclerosis. If the thrombosis results from a blood clot that breaks off from another part of the body the occlusion takes place in a matter of seconds, but to assume that this occurred it would be necessary to assume that the person had a blood clot in some other part of the body.

It can be fatal but that result is not common. Whether a thrombosis that develops at the site of the occlusion will be fatal depends upon how much and how long the

blood supply is cut off. As the internal diameter of the blood vessel becomes less a thrombosis can form suddenly at the site of the occlusion. It takes from a few minutes to an hour or two for this condition to develop. Dr. Huckstep further testified that the only positive way to determine whether the final closure was due to arteriosclerosis or a thrombosis from another part of the body, or a combination of both, was to perform an autopsy. Neither could he say at what time the occlusion developed.

Claimant's physician, Dr. A. J. Steiner, a heart specialist of St. Louis, examined claimant July 21, 1965. Claimant gave the doctor a history of the events which occurred February 6, 1963. He also told Dr. Steiner about the chest pain he suffered prior to February 6, 1963 which he usually experienced on exertion when out in cold weather, but which would disappear when he went into a warm place. He stated that his present complaints were left chest pain produced by exertion, by exposure to cold weather and even when walking on a level surface. He also told the doctor that the pain would recur after his evening meal, and if he smoked two or three cigarettes in succession.

Dr. Steiner's examination was mainly of the heart and lungs. It included an x-ray of the chest and an electrocardiogram. He also examined the EKG taken by Dr. Huckstep June 13, 1962 and the one taken on February 8, 1963.

To a question hypothesizing the facts developed by the evidence, Dr. Steiner gave it as his opinion that claimant's accidental slip, strain and fall which occurred February 6, 1963 did produce the acute myocardial infarction for which he was treated at St. Luke's Hospital and that he was one hundred percent disabled. He further testified that the fact claimant perspired profusely at the time in question indicates claimant suffered a shock-like episode of a serious nature and, based upon the findings and history given, Mr. Govreau's disability was permanent.

Dr. J. P. Murphy, an internist, examined claimant July 2, 1965 at defendant's request. His deposition was taken September 21, 1966 by defendant's attorneys and introduced by them at the hearing before the referee. It appears from the testimony of Dr. Murphy that claimant gave a history of severe chest pain when he reached up and raised his left leg to get into the trailer. This caused him to fall forward into the trailer. He perspired quite heavily, and the pain persisted for a while. In answer to a hypothetical question, the doctor stated he did not feel that the fact claimant's foot slipped when he was climbing into the truck had anything to do with the cause of the myocardial infarction, but that it was caused by a thrombosis in one of the coronary arteries due to arteriosclerosis. On cross-examination the doctor testified that excessive perspiration is evidence of a heart attack.

Dr. Martin W. Davis examined claimant at the request of the employer and its insurer, and testified on their behalf by deposition. The deposition was introduced by them at the hearing before the referee, and is before this court as a part of the transcript. The doctor examined claimant on October 11, 1966. He made a complete examination which included an x-ray and an electrocardiogram. The EKG revealed evidence of a myocardial infarction which in his opinion was not related to the accident. He did testify that he thought it likely that the infarction occurred about the time the claimant was climbing into the truck or shortly before; that claimant first noticed the symptoms at that time, but it would be impossible with certainty to pinpoint when it occurred. The doctor testified on direct examination that he did not believe there would be any significant difference between the effort involved in climbing into the truck and claimant supporting his weight by his arms when his foot slipped. Dr. Martin further testified that he did not believe the myocardial infarction was precipitated by claimant's foot slipping or that claimant's heart attack was related in any way to his occupation.

Edward W. Bilhorn, a consulting engineer, testified on behalf of Farmington Transfer and its insurer. He testified that the floor of a truck four feet above the pavement would reach the body of a man five feet eight inches tall, standing at the rear of the truck, at approximately the area below the nipple line; and a truck four and one-half feet above the pavement approximately three inches above the nipple line. The witness further testified that at the time claimant attempted to pull himself into the trailer by taking the weight off his right foot and elevating himself with his left foot and arms, it was not possible for his foot to slip approximately two feet forward. He stated that for claimant to have fallen lengthwise into the trailer he would have had to elevate his body two feet above the level of the truck bed. The witness further testified that the force required to elevate the body would be more than that exerted by his left foot against the truck bed.

The first point briefed is that the trial court erred in affirming the award of the Commission. In support of this assignment it is urged that the testimony of claimant relied on by him as proof that an accident did occur in fact showed that it was physically impossible for claimant to have been injured by accident, and for that reason there was not substantial evidence to support the award. As proof of the point urged appellant relies on the testimony of Edward W. Bilhorn heretofore set out. Appellant produced no other evidence to refute claimant's testimony concerning the manner in which the alleged accident occurred.

It is clear that Mr. Bilhorn's testimony was pure speculation and guesswork. There is no evidence that he had ever seen claimant or knew his physical measurements such as the length of his legs, arms or neck. He did not know how far to the

rear of the trailer claimant was at the time he raised his arms, placed his hands on the trailer, raised his left foot to the rear of the trailer, and raised his body in an effort to enter the trailer.

The Commission found the expert sworn testimony of Mr. Bilhorn that it was not possible to enter the trailer in the manner prescribed by claimant was not sufficient to destroy the employee's credibility; that such conclusion could only rest on speculation. The Commission also found that claimant's attempt to gain entry into the trailer involved a vaulting action, and while thus engaged his foot slipped which weakened to some degree the propulsion of his legs, partly arrested the upward vaulting action, and threw him into an awkward extended position which produced an unusual strain that precipitated a myocardial infarction. In our opinion these findings are reasonable, being supported by competent and substantial evidence, and not contrary to the overwhelming weight of the evidence. We therefore are not authorized to set aside the Commission's award. Wood v. Wagner Elec. Corp., supra; Seabaugh's Dependents v. Garver Lumber Mfg. Co., supra.

■ Appellant contends there was no credible evidence to support the allegation that claimant suffered a compensable accident and for that reason the judgment should be reversed. In support of this contention appellant relies upon the fact that claimant's testimony relating to how the accident happened differs from the allegations with respect thereto contained in the claim for compensation; the testimony of Mr. Hathaway that claimant never told him of having sustained an accident; and the fact that in the history given by claimant at St. Luke's Hospital he made no mention of an accident but stated he experienced pain by lifting and exertion.

In the claim for compensation it was alleged that claimant was unloading freight from the rear of the trailer when his foot slipped causing an unusual strain which caused a heart attack. The claim was prepared by David Colson, attorney for claimant. Claimant testified he signed the claim without reading it. He further stated he told Mr. Colson he had slipped in the trailer. Mr. Colson was not called as a witness. Claimant testified he did in fact inform Mr. Hathaway he slipped in the truck. It does not appear from the hospital record that the intern who took claimant's history at the hospital made any inquiry concerning an accident. This history was taken by the intern the day claimant arrived at the hospital. Before leaving for the hospital on that day he was put under strong medication which consisted of morphine and nitroglycerin. When he arrived at the hospital he was put to bed immediately. Claimant testified that the doctor at the hospital might have asked him about the history of his chest pains but because of his condition caused by the medicine he did not recall such questioning. It would seem from the testimony that he was in no condition to volunteer any information. We find the contention that by reason of the alleged contradictory testimony claimant's credibility was destroyed leaving no credible evidence to support a finding that claimant suffered a compensable accident is without merit. The alleged contradictory evidence and claimant's previous testimony as to how the accident happened presented a question of credibility which was settled by the Industrial Commission. Appellant contends that even if claimant proved he had an accident which produced a strain, a finding that the strain caused the heart condition could only rest on speculation and conjecture. After considering the evidence we are of the opinion there is no merit to the point urged. We have heretofore set forth in this opinion a résumé of this evidence. We deem further discussion of the point unnecessary.

The judgment is affirmed.

BRADY, P. J., and DOWD and WOLFE, JJ., concur.